FILED
2014 Jul-15  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

|                             |     |                 |
|-----------------------------|-----|-----------------|
| DARYL ARCHIBALD,            | )   |                 |
|                             | )   |                 |
| Plaintiff;                  | )   |                 |
|                             | )   |                 |
| vs.                         | )   | 7:12-cv-03492-LSC |
|                             | )   |                 |
| UNITED PARCEL SERVICE CO    | )   |                 |
| INC., et al.,               | )   |                 |
|                             | )   |                 |
| Defendants.                 | )   |                 |

## MEMORANDUM OF OPINION

Plaintiff Daryl Archibald ("Archibald") brought this civil rights action against Defendants United Parcel Service, Inc. ("UPS") and Jaime Diaz ("Diaz"), alleging various types of racially discriminatory and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"). Specifically, Archibald contends that UPS and Diaz (collectively, the "Defendants") made a series of decisions to either discipline him or pass him over for various assignments that constitute racial discrimination, retaliation, and harassment. Both UPS and Diaz have moved for summary judgment on all claims against them (Doc. 23), and in addition to opposing summary judgment, Archibald has

filed a motion for leave to file an amended complaint. (Doc. 27.) For the reasons stated below, the Defendants' motion for summary judgment is due to be granted, and Archibald's motion for leave to amend is due to be denied.

## I.   BACKGROUND[1]

### A.   Employment History

UPS hired Archibald on January 3, 2005, to work at its package center in Tuscaloosa, Alabama (the "Package Center"). Initially, he worked as a preloader, a part-time, hourly position where employees load packages onto UPS package cars[2] in the early morning hours. Archibald's general preload schedule required him to work from 3:00 AM until 8:30 or 9:00 AM, though the start time varied with the volume of the load at the Package Center.

Some time after he started as a preloader, Archibald sought work as a temporary cover driver ("TCD") for UPS. Although UPS package cars were regularly driven by

---

[1] Archibald failed to include a statement responding to *any* of the Defendants' undisputed facts, in numbered paragraphs or otherwise. Additionally, he failed to include his *own* statement of disputed or undisputed facts in a discrete section of his brief and instead dispersed various facts throughout his brief opposing summary judgment. As such, Archibald did not comply with the Uniform Initial Order the Court entered in this case on February 7, 2013. (Doc. 12 at 16–17.) When a party fails to properly address another party's statement of facts, the Court may treat these facts as undisputed. Fed. R. Civ. P. 56(e)(2). The Court thus accepts the Defendants' statement of material facts, but it has also reviewed the Plaintiff's various factual statements placed throughout his brief and notes that they are generally consistent with the Defendants' facts.

[2] The "package car" is the brown delivery truck that UPS uses to make local deliveries.

full-time package car drivers, the TCDs received the same training and certification as package car drivers, were subject to the same rules, and filled in for package car drivers when they were absent. In order to become a TCD, Archibald bid for the position, and after he was selected in October 2010 he attended UPS's five-day driver training course. Nick Spain, Jacob Mathis ("Mathis"), and Matthew Syx ("Syx") also attended the training course from the Package Center at the same time as Archibald. Upon returning from the course, Archibald, like all other drivers, was required to deliver ground packages for 30 days over a 120-day period to qualify as a driver. During this period, he had to avoid any accidents or injuries and pass a "qualification ride." Archibald ultimately completed these requirements and was qualified as a driver. Among the drivers who attended driving school on this occasion, Archibald qualified first.

Once Archibald was qualified as a TCD, he could be dispatched to drive a package car as needed. However, Archibald continued to work primarily as a preloader for UPS. After several years of working as a preloader and TCD, Archibald was promoted to a full-time position as a package car driver in March 2013, and he continues to hold that position at UPS.

### B.    Purported Wrongful Conduct

At all times throughout his employment, Archibald has been a member of the International Brotherhood of Teamsters ("Teamsters") union, and the terms and conditions of his employment have been governed by a collective bargaining agreement ("CBA") between UPS and Teamsters. Both parties admit that Archibald has filed a large number of grievances under the CBA against UPS. Archibald asserts that many of these issues stem from his difficult relationship with Diaz, who began working as the Package Center's business manager in May 2010, and he claims that many of these issues have improved since Diaz left the Package Center in March 2014.

Archibald contends that the inappropriate conduct began after he expressed interest in becoming a TCD and continued as he sought to become a package car driver. First, he notes that he was required to memorize and was regularly quizzed at work on UPS's "5 Seeing Habits" and "10 Point Commentary" describing proper driving procedures before attending driving school. UPS claims that Diaz and others at the Package Center quizzed Archibald so that he could pass the written and verbal tests at driving school, but Archibald contends that other prospective drivers were not required to memorize these documents before attending the school.

After he began to work as a TCD, Archibald indicates that he was passed over for driving routes in favor of less senior TCDs. In response to these assignments,

Archibald filed several grievances based on purported violations of seniority. On October 3, 2011, Archibald filed a grievance complaining about TCD work assignments. UPS ultimately resolved the grievance by paying him for five days of time that he allegedly missed and agreeing to abide by the rules of seniority in making driving decisions. Subsequently, Archibald filed additional grievances regarding TCD assignments, each based on a single day, on March 4, 2012, July 6, 2012, and September 18, 2012. UPS compensated Archibald for the March and September grievances, but the July grievance was resolved in UPS's favor. Each grievance contains a section where the employee should list the article or articles of the CBA that UPS allegedly violated. Although Archibald included both the articles for nondiscrimination *and* seniority in his October 2011 grievance, he only referenced the article pertaining to seniority in his other grievances.

Archibald now claims that UPS made TCD assignments on the basis of race. However, UPS indicates that it selected drivers based on non-discriminatory factors. For example, UPS stated that it sometimes chose drivers over Archibald based on the driver's route knowledge. In other cases, UPS needed to assign a driver so that he could be qualified as a TCD. Finally, UPS noted that it was often difficult to schedule Archibald due to his primary job as a preloader. Only one other TCD, Syx, worked

primarily as a preloader. Both UPS and Department of Transportation ("DOT") Regulations prohibit drivers from working over 12 consecutive hours.[3] Because Archibald had to show up early in the morning for the preload, UPS would often not know that a route was open until Archibald would be ineligible due to these restrictions.

Regarding TCD assignments, Archibald also complains that UPS employees would often call him early in the morning to notify him about available TCD assignments. He claims that this disrupted his sleep and work schedules. However, UPS contends that the calls were merely a courtesy to maximize the number of driving opportunities available to Archibald.

Additionally, Archibald was not promoted to the full-time position of package car driver until 2013. He now claims that he should have been promoted in August 2010, when UPS promoted Jared Courington ("Courington") and Kenny Jemison ("Jemison") to package car driving positions. Courington is white, but Jemison is African-American. Archibald contends that he also bid for this position along with the TCD position and that he should have been entitled to Courington's promotion.

Finally, Archibald complains about various forms of discipline and observation

---

[3] It appears from the record that the DOT regulations prohibit 14 hours, and the UPS rules prohibit driving after 12 hours.

that he received throughout his employment with UPS.[4] According to Archibald, Diaz singled him out for discipline for violating UPS's appearance policies. Specifically, Diaz disciplined Archibald on various occasions for having a visible tattoo outside his uniform or when he had his hair in braids that went below his collar. Although he received notices evincing intent to suspend or discharge him on various occasions, all but one of these notices were ultimately reduced to warnings. Additionally, Archibald suggests that he was excessively observed on routes and written up for driving and delivery methods violations. He also claims that UPS singled him out for violations of its attendance policies. Archibald was disciplined on multiple occasions and was ultimately suspended for one day in February 2012 due to his attendance. This one-day suspension for attendance issues was the only suspension that Archibald actually received for disciplinary reasons.[5]

---

[4] It is unclear from the record exactly when and to what extent Archibald received discipline for these various issues. For example, the Defendants indicate that Archibald received warnings for appearance issues in November 2011, December 2011, April 2012, and July 2012, whereas Archibald notes generally throughout his brief that he was repeatedly disciplined for these types of issues. Given that Archibald neither responded to the Defendants' statement of undisputed facts *nor* prepared his own statement of undisputed facts in clearly numbered paragraphs, it is difficult to ascertain when particular disciplinary actions occurred. For summary judgment purposes, the Court accepts that Archibald was disciplined on multiple occasions throughout the period in question for these categories of violations.

[5] There are several other incidents discussed in Archibald's deposition that have been abandoned. First, Archibald referenced difficulty using UPS-issued cards that drivers used to purchase fuel when necessary for their package car. (Doc. 25-1 at 397–99.) Additionally, he referenced an occasion where he was sent home from work for not having his shoes properly shined

Along with his informal grievances, Archibald filed two charges with the Equal Opportunity Employment Commission ("EEOC"). First, he filed a charge in October 2011, complaining that UPS discriminated on the basis of race when assigning TCD opportunities from April 2011 through October 2011. He both sought and received a right to sue letter regarding this charge in July 2012. Second, Archibald filed another charge in August 2012 complaining about many of the disciplinary practices described above. Archibald again requested and received a right to sue letter in May 2013. He claims that the conduct described above also constitutes retaliation for filing these charges.

## C.    PROCEDURAL HISTORY

After receiving the first right to sue letter from the EEOC but before obtaining the second, Archibald filed suit in this Court on September 29, 2012.[6] Upon completion of discovery, the Defendants moved for summary judgment on April 17,

---

but was subsequently called back when another driver was sent home. (*Id.* at 370–71.) Archibald also alluded at his deposition to other instances where Diaz or another supervisor discussed a potential disciplinary issue with him informally but never formally disciplined him. Even though UPS referenced the gas card issue in its brief supporting summary judgment, Archibald has not made any arguments regarding these issues in his brief opposing summary judgment. Thus, the Court considers any arguments based on these incidents abandoned. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

[6] Archibald never filed an amended complaint after receiving the second right to sue letter.

2014. Both parties agree that Archibald seeks recovery on theories of racial discrimination and retaliation under Title VII and § 1981, but they disagree as to whether Archibald has pursued a hostile work environment claim. This Court has federal question jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1331.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *see also Avenue CLO Fund, Ltd. v. Bank of Am., NA*, 723 F.3d 1287, 1294 (11th Cir. 2013). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249, 106 S. Ct. at 2511.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender*

*Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee*, 719 F.3d at 1242. Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## III.   DISCUSSION

### A.   Racial Discrimination

Archibald claims that Diaz and UPS treated him differently from similarly situated white employees and thus has brought disparate treatment racial discrimination claims under both Title VII and § 1981. *See Powers v. Ala. Dep't of Educ.*, 854 F.2d 1285, 1288 n.4 (11th Cir. 1988) (describing the difference between disparate treatment and disparate impact claims and emphasizing that disparate

treatment claims implicate both § 1981 and Title VII). Although Archibald's discrimination claims were brought under both Title VII and § 1981, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).[7] Thus, except where otherwise indicated, the Court considers both the Title VII and § 1981 claims under the common framework without distinguishing between the two. *See id.*

"A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004). However, "'direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor.'" *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)). In its motion for summary judgment, the Defendants stated that Archibald's race discrimination claims are based only on circumstantial evidence. (Doc. 24 at 24.)

---

[7] Archibald's complaint could be read to allege a Title VII claim against both UPS and Diaz in his individual capacity as Archibald's supervisor. Diaz contends in his brief that Archibald cannot recover against him in an individual capacity under Title VII. (Doc. 24 at 24 n.1.) The Eleventh Circuit has established "that relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act, *regardless* of whether the employer is a public company or a private company." *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (emphasis in original). Insofar as Archibald attempts to bring Title VII claims against Diaz in his individual capacity, summary judgment is due to be granted as to such claims.

Although Archibald's responsive brief opposing summary judgment makes several cursory statements about "direct evidence," it is clear to the Court that he is basing his claims on circumstantial evidence.[8]

Where, as here, "a plaintiff attempts to prove intentional discrimination . . . using circumstantial evidence, [the Court applies] the now familiar shifting burden framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Schoenfeld*, 168 F.3d at 1267. First, the plaintiff must generally establish a *prima facie* case of discrimination.[9] *Id*. If the plaintiff can meet this burden, an inference of discrimination

---

[8] In a section entitled "Plaintiff's Grievances," Archibald claims that "[w]hile working at UPS, as direct evidence of the constant and continuous harassment, Plaintiff has had to file . . . an unnecessary amount of grievances to deter and correct the alleged violations." (Doc. 29 at 5.) However, he makes no attempt to explain how this constitutes "evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989).

[9] In some cases, a plaintiff may be able to establish an inference of discrimination without satisfying the *prima facie* case. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). Archibald claims at the conclusion of his brief that "[t]he constellation of events and the evidence presented by Plaintiff in this case is sufficient to survive [summary judgment]." (Doc. 29 at 19.) However, this portion of his brief contains no citations to evidence in the record, and he makes no attempt to explain how he can establish an inference of racial discrimination without satisfying the *prima facie* case. *Cf. Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) (finding that there was circumstantial evidence of discrimination even if the *prima facie* case was not satisfied because the plaintiff presented evidence of a significant investigation into other discriminatory conduct that may have affected the employer's willingness to terminate employees for inappropriate conduct). Archibald's unsubstantiated assertion that the conduct in this case allows an inference of racial discrimination without establishing the *prima facie* case, without more, is

arises that the Defendant must refute by articulating "a legitimate, non-discriminatory reason for its action." *Id.* The Defendant's burden at this stage is light, as "[t]he employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced." *Hall v. Ala. Assoc. of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003). If the employer can articulate a legitimate reason, "then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination." *Schoenfeld*, 168 F.3d at 1267. Upon reaching this stage of the analysis, the Plaintiff must show both that the employer's reason for the employment action is false *and* that discrimination is the real reason behind the employment action. *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir. 2007).

### i. Failure to Promote

Archibald claims that UPS violated Title VII and § 1981 and Diaz violated § 1981 when they promoted Courington and Jemison to package car driver positions in August 2010. In order to support a failure to promote claim, the plaintiff generally must present circumstantial evidence to support the *prima facie* case of the *McDonnell*

---

insufficient to survive summary judgment. *See Rollins*, 833 F.2d at 1529. Indeed, the record evidence indicates that Archibald has premised his racial discrimination claims on comparisons to similarly situated white employees.

*Douglas* framework: "(1) he is a member of a protected class, (2) was qualified and applied for the position at issue, (3) was rejected, and (4) the position was filled by a person outside the protected class." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 973 n.41 (11th Cir. 2008). As to the *prima facie* case, the Defendants apparently concede that Archibald was a member of a protected class, that he was both qualified and applied for the promotion, and that he was rejected.[10] However, the Defendants contend that he failed to show that the position was filled by a person outside the protected class.

UPS had two package car driving positions open in August 2010, and it selected Courington and Jemison for the positions. It is undisputed for purposes of summary judgment that Courington is white but Jemison is African-American. UPS decided to promote the two drivers at the same time, but the Defendants technically promoted Courington on August 26, 2010, and Jemison on August 27, 2010. Diaz testified that he proposed the different dates in order to prevent two drivers from having the same seniority date and causing "confusion when we do vacation selections and annual bids." (Doc. 25-3 at 135–36.)

---

[10] There is some ambiguity in the record as to whether Archibald's name was on the bid sheet for the promotion, but the Defendants have not raised this issue. However, the Defendants have raised several other issues, including that this claim was never properly pleaded in the complaint and that it is time-barred. Since the Court concludes that the Defendants are entitled to prevail on the merits of the claim, it does not reach these additional issues.

It is undisputed that the proper order of seniority, from greatest to least, was Archibald, Courington, and Jemison.[11] Even if UPS had promoted Archibald, the Defendants claim that UPS would still have promoted Courington. Thus, they suggest that Jemison was the only driver actually "promoted over" Archibald, and both of these individuals were members of the same protected class.

Here, the Court gives Archibald the benefit of the doubt that the trier of fact could conclude that Courington is the proper comparator. Diaz admitted at his deposition that he promoted Courington first to provide him with additional benefits as a result of his seniority. Moreover, Diaz testified that seniority was the only relevant consideration in making the promotions, and thus Courington is a similarly-situated but less senior employee outside the protected class. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (explaining that comparators must be "'similarly situated in all relevant respects'" (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). The fact finder could conclude that Courington was promoted over Archibald so that he could have superior benefits to the other African-American driver, Jemison. *Cf. McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (noting

---

[11] At his deposition, Diaz testified ambiguously that "Daryl is senior and then Kenny and then Daryl." (Doc. 25-3 at 110.) However, the Defendants attached an errata sheet at the end of the deposition that makes clear that the order of seniority was Archibald, Courington, and Jemison.

that the plaintiff could not make out a failure to promote claim because "[t]he only evidence presented . . . demonstrates that the two candidates promoted were black").

However, even if he satisfies the *prima facie* case, Archibald's claim still fails, as the Defendants have identified a non-pretextual reason for the promotions that Archibald has failed to rebut. *See Holifield*, 115 F.3d at 1564–65 (noting that the defendant must articulate a legitimate, non-discriminatory reason for an employment action but indicating that upon doing so the plaintiff must show that discrimination was the real reason for the action). According to the Defendants, Diaz promoted Courington and Jemison because the UPS human resources ("HR") department informed him that they were next in line to become package car drivers. Diaz indicated that he was unable to review the bid sheet from which they were selected, had no reason to question whether Courington and Jemison were the appropriate candidates, and was unaware of the issue until Archibald filed a grievance in January 2013, over two years after the promotions. (Doc. 25-4 at 15–16 ¶ 26.)

Essentially, the Defendants' non-discriminatory reason for the promotions is that someone at UPS erred in calculating Archibald's seniority. *See McWilliams v. Escambia Cnty. Sch. Bd.*, 658 F.2d 326, 331 (5th Cir. 1981) ("The employer need not persaude the district court that it was actually motivated by the reasons advanced,

because the employer bears only the burden of production, not the burden of persuasion."). Diaz elaborated at his deposition that Archibald's "seniority is not where it should be [, but] [i]f he had sought remedy, we could have made him whole. We would have dovetailed him in ahead of Courington and Jared, and he would have been given 30 days to qualify as a driver then."[12] (Doc. 25-3 at 137.) A mistaken belief can be a legitimate, non-discriminatory reason for an employment action because even a false reason for taking an action places the burden on the plaintiff to show that *race* was the real reason for the employment action. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001) ("Even if we believed, as the district court did, that the Board was not bound by an old agreement . . . , that would only establish the Board was mistaken, and an employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII.").

Archibald, in a section of his brief opposing summary judgment entitled "Defendants' Defense as a Pretext," attempts to rebut the Defendants' purportedly neutral justification for the promotion. First, he points to a statement from K.J.

---

[12] The use of the name "Jared" appears to be an error. It appears from the context that this statement is referring to Courington and *Jemison*. Either way the import is clear— Archibald would have been given the first opportunity for the job.

Johnson ("Johnson"), a fellow UPS employee, but Johnson's statement only indicates that he did not assign any employees full-time positions over Archibald. (Doc. 29-1 at 1.) He neither indicates who *did* make such decisions nor that any individuals who played a part in that decision were motivated by race. Additionally, Archibald attached a hand-written note from UPS employee Vincent Beverly ("Beverly") to his brief opposing summary judgment. Beverly indicates that Archibald "has been pass[ed] over for favoritism by other employees through management by not going by proper seniority." (Doc. 29-3 at 1.) This statement does not suggest that *race* was the real factor behind the promotions decisions. *See Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012) (explaining that a plaintiff does not survive summary judgment merely by showing that the defendant's proffered neutral reason is actually false).[13] Moreover, neither of these statements provide any evidence from personal knowledge as to how UPS made its promotions decisions.

Additionally, Archibald cannot rely upon his own testimony to establish pretext.

---

[13] Archibald also pointed to a statement by Diaz. Apparently, another UPS employee told Archibald that Diaz indicated that Archibald would not be able to afford his car if Diaz reduced his hours. However, Archibald makes no attempt to explain how this vague statement was connected to his *race*, and he admitted at his deposition that he was unaware of anyone at UPS making race-based comments about him. (Doc. 25-1 at 422.) Thus, Archibald himself admitted that this ambiguous statement was not racial in nature. Even had he suggested otherwise, this lone secondhand statement cannot survive summary judgment on a racial discrimination claim based on the promotion. *See Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 647–48 (11th Cir. 2005). The other facts Archibald listed relate to cover driving opportunities, which the Court discusses below.

He acknowledged that he was unfamiliar with the process for reviewing the bid sheet:

> Q.   Do you know who put it up at UPS?
> A.   No.
> Q.   Do you know who took it down?
> A.   No.
> Q.   Do you know who reviewed the bid sheet to select who would fill the driver positions available at the time?
> A.   No.
> Q.   Did you ever talk to Mr. Diaz about that bid sheet?
> A.   No.

(Doc. 25-1 at 489.) During his deposition, Archibald speculated that he may have been passed over because it looks "like it's some kind of vendetta against either me, or like I say, I'm a young black guy with braids and a tattoo." (Doc. 25-1 at 403.) This statement is insufficient to defeat summary judgment for two reasons. First, as Archibald admitted, he had no personal knowledge of the bid and selection process, making this statement purely speculative. *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (internal quotation marks and emphasis omitted)). Second, Diaz testified that he was new to UPS at the time of the promotions in 2010, and he did not even know Archibald personally. Archibald does not provide any evidence contesting this fact, and Archibald's earliest complaints about Diaz "singling him out" date to 2011, at

least several months after the promotions.[14]

In sum, no reasonable trier of fact could find for Archibald on the ultimate issue— that he was intentionally discriminated against *due to his race* when the Defendants promoted Courington and Jemison. *See Holifield*, 115 F.3d at 1565. Summary judgment is due to be granted on the failure to promote claim.

### ii.    Assignment of Cover Driving Opportunities[15]

Next, Archibald contends that the Defendants failed to provide him with adequate cover driving opportunities. He also claims that UPS only notified him of potential driving opportunities at the last minute, often calling him early in the morning to notify him about open routes. In order to establish a *prima facie* case based on his cover driving opportunities, Archibald must show: (1) he is a member of a racial minority; (2) he suffered an adverse job action; (3) similarly situated employees were

---

[14] Although many of Archibald's dates are vague, the earliest reference to a problem with Diaz that the Court can locate in the record is April 2011. Archibald referenced this as the start date for his EEOC allegations.

[15] Archibald references a recording of a meeting with Diaz regarding cover driving assignments. He provided a copy of this recording on a compact disc ("CD") to the Court with his courtesy copy of his summary judgment materials. However, he never properly placed this material in the record. Instead, he placed in the record a photocopy with an image of what appears to be a CD on a page marked "CD of Jaime Diaz Meeting." (Doc. 29-7.) A photocopy depiction of a CD on a piece of paper does not constitute filing materials with the Court nor does sending physical materials to the Court as a courtesy copy. Under Rule 56, the Court can only evaluate "particular parts of materials *in the record*." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Thus, the Court has not reviewed the audio in ruling on summary judgment because it was never placed in the record.

treated differently; and (4) he was qualified for the work. *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). As to his cover driving opportunities, UPS contends that Archibald has failed to show that similarly situated employees were treated differently. An employee is "similarly situated" if he or she is similar to the minority employee in all relevant aspects but is treated differently. *See Holifield*, 115 F.3d at 1562.

Cover drivers must be qualified after completing the UPS driving course, and Archibald admits that Diaz qualified him before any of the other white employees who took the course with him.[16] (Doc. 25-1 at 187.) Regarding his assignments, Archibald identified a number of white cover drivers as possible comparators. However, the Defendants claim that most of these comparators were assigned the primary duty of working the afternoon sort shift. As a preloader, Archibald would often have to arrive at work early, and UPS would not learn of an available driving slot until after he had begun work. (Doc. 25-7 at 5–6 ¶ 10.) Additionally, DOT and UPS rules precluded a

---

[16] Archibald indicated that at one point he informed Diaz that he was ready to qualify, and Diaz told him that he would disqualify him because he was not yet ready. It is unclear to the Court whether Archibald is advancing a claim based on such a statement. However, Archibald has not shown how this statement amounts to an adverse employment action because he admits that he was qualified first and points to no opportunities that he was denied as a result of any intervening delay in his qualification. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (explaining that an employment action is only adverse for purposes of a discrimination suit if it has a "real and demonstrable" impact on an employee's job).

driver from working more than 12 consecutive hours, making it difficult to schedule Archibald to drive after he worked the early preload shift. Since drivers working the afternoon sort could regularly be scheduled to work routes that came open later in the morning, the Defendants contend that these drivers are not proper comparators because they are not "similarly situated in all relevant aspects." *Holifield*, 115 F.3d at 1562. UPS points to Syx, the only other preloader who was also a cover driver, as the only proper comparator, and Archibald does not offer any argument to the contrary.[17] Treating Syx as the proper comparator, the Court must consider whether Archibald can survive summary judgment on his various claims about cover driving opportunities.

First, Archibald testified at his deposition that he was not given sufficient training when he was first qualified as a TCD. He testified that he was trained only on half a "cut-in" route and not trained on any additional routes.[18] However, he did not

---

[17] Upon its own review of the record, the Court found a statement in Archibald's deposition testimony where he indicated that he joined the afternoon sort shift for "[m]aybe six months to a year." (Doc. 25-1 at 146.) He indicated that this began in 2011, after he became a cover driver, but he offered no particular dates. Archibald has not raised this issue to the Court, nor has he provided any additional information in the record to suggest when Archibald worked in this position. Thus, the issue is abandoned. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000)("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

[18] Archibald refers to the route as a "cut-in" route, or a route that was not run year-round. However, Shelton indicated in an affidavit that the route was part of a regular unassigned route and stated that other drivers had successfully trained on the route. Archibald has placed no evidence in

advance any arguments about the extent of his training in his brief opposing summary judgment. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Indeed, Archibald makes repeated assertions to the *superiority* of his training throughout his brief.[19] Thus, any argument regarding proper variation in his route assignments is abandoned. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1310, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

Archibald also contends generally that he was entitled to more frequent driving opportunities. However, UPS has offered legitimate, non-discriminatory reasons for this decision. Archibald concedes that on a number of occasions Syx was driving for qualification and needed to drive more frequently.[20] He also admits that the Package

---

the record to suggest that his route differs from routes where other drivers typically trained.

[19] For example, Archibald indicated that he "has obtained the adequate and necessary driver training to be promoted and maintain a fulltime route position as a UPS driver." (Doc. 29 at 4.) Elsewhere, he claims that he should've been promoted because he was entitled to TCD assignments *because* he "was most qualified through training and seniority." (*Id.*)

[20] In order to be qualified, a driver needed to deliver packages for thirty days in a one hundred twenty day period. (Doc. 25-1 at 193–94.)

Center *needed* more qualified cover drivers, and thus this is a legitimate, race-neutral justification for the assignments. *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("Provided that the proferred reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."). Archibald has not even "quarrel[ed] with the wisdom of that reason," and thus summary judgment is due to be granted as to these claims. *Id*.

Although Archibald has placed several pages of handwritten notes into the record when other TCDs, including Syx, drove over him, Archibald created this list based *solely* on seniority.[21] Neither the list nor any of the other evidence in the record suggests that UPS made an assignment to Syx on a particular date for any reason other than his route knowledge or a desire to get him training experience. Even though Archibald indicated that he thought the assignments were based on race, he testified that he was not present when routes were assigned and did not know the order in which they were assigned. The dispatcher, Dave Shelton, stated that he always attempted to assign routes based on seniority and route knowledge and never indicated that he made such assignments based on race. Left with only the

---

[21] The list contains a variety of dates from August and September 2011. According to this list, Syx drove over him on 15 occasions in August and September 2011: August 8, August 9, August 10, August 11, August 12, August 15, August 16, August 17, August 19, August 26, September 6, September 21, September 22, September 23, and September 30. (Doc. 29-13 at 3–5.) Archibald has not pointed the Court to any other records or dates when Syx drove over him.

inconclusive handwritten notes and Archibald's speculation about how route assignments were distributed, it would be impossible for a reasonable fact-finder to infer that UPS's assignments were pretexts for discrimination. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (explaining that to survive summary judgment the plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination").

Finally, Archibald has also failed to produce evidence that similarly situated employees were treated differently in terms of how they were notified of cover driving opportunities. He has not indicated that he knows when particular rides came available or when other drivers were informed, though he did note that generally drivers would be told the day before. (Doc. 25-1 at 239.) There is also no evidence to suggest that Syx, the appropriate comparator, was informed of routes without receiving these phone calls. At one point, when discussing attendance issues and the early phone calls, he indicated that he believed this was racially motivated "because Matt Syx didn't have to go through that." (*Id.* at 364.) However, this conclusory statement alone is not sufficient to survive summary judgment. *See Rollins*, 833 F.2d at 1529 (noting that unsubstantiated assertions cannot defeat summary judgment). Outside Archibald's deposition, there is no other evidence to suggest that he was

assigned routes differently from other drivers.

In sum, Archibald has failed to show that UPS's methods for assigning TCD work were a pretext for racial discrimination. He also failed to produce any evidence to suggest that he should have been notified sooner about driving opportunities. Summary judgment is due to be granted on all the claims regarding Archibald's TCD work assignments.

### iii.    Discriminatory Discipline

Finally, Archibald raises a series of disciplinary decisions that he contends were racially discriminatory. He argues that UPS disciplined him unfairly for alleged violations of UPS's attendance, appearance, and driving and delivery method policies. Additionally, he complains that he was repeatedly quizzed on several UPS driving instruction sheets before he left to attend driving school.

In order to establish a *prima facie* case as to any of these claims, Archibald must show: (1) membership in a protected class; (2) that he was subjected to an adverse job action; (3) that his employer treated other similarly situated employees more favorably; and (4) he was qualified for the job. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Brooks v. CSX Transp., Inc.*, 555 F. App'x 878, 883 (11th Cir. 2014) (indicating that this statement of the *prima facie* case applies to

discriminatory discipline claims). As with the other claims, it is undisputed that Archibald is a member of a protected class. Moreover, neither party has disputed that Archibald has been qualified for the various jobs he has performed for UPS. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (noting in the related area of termination cases that qualifications may often not be at issue and may be inferred if the plaintiff has held a position for a significant period of time). However, Archibald cannot show that he experienced an adverse employment action.

An employee raising a discrimination claim under Title VII and § 1981 must ultimately show that he was subjected to an "adverse employment action." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (internal quotation marks omitted). In order to satisfy this standard, "the employer's action[s] must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). Such an action need not have direct economic consequences, but "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* As with the other elements of the *prima facie* case, it is the Plaintiff's duty to establish that there was an adverse employment action. *See Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013) (noting that the plaintiff bears

the burden to "establish by a preponderance of the evidence a prima facie case of discrimination").

Although Archibald was disciplined on multiple occasions for various violations of UPS procedures, he was only actually suspended for one day. While he received notices either to suspend or discharge him on various occasions, these notices were never actually implemented against him. *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) ("Mere threats of alleged adverse employment action are generally not sufficient to satisfy the adverse action requirement."). Archibald successfully reduced all but one of the sanctions to a warning notice through UPS's grievance process, and he has not pointed to any adverse employment action based on these notices. *See Filius v. Potter*, 176 F. App'x 8, 11 (11th Cir. 2006) (explaining that there was no adverse employment action when a suspension was reduced to a discussion about the conduct and the plaintiff had not pointed to any evidence to suggest that this had any effect on his future job prospects).

Turning next to the discipline that Archibald actually received, none of the discipline amounts to an adverse employment action. Archibald has not produced any evidence that suggests the disciplinary warnings had any adverse impact on his employment with UPS. *See Butler*, 536 F.3d at 1216 (noting that various warnings and

reprimands did not change the terms, conditions, or privileges of the plaintiff's employment). Additionally, his one-day suspension did not amount to an adverse employment action, either. *Embry v. Callahan Eye Found. Hosp.*, 147 F. App'x 819, 829 (11th Cir. 2005) (concluding that a one-day suspension was not an adverse employment action under Title VII).[22]

Additionally, Archibald has failed to produce any evidence to suggest that similarly situated employees were treated differently. Even if Archibald did *not* violate some of the rules in question (as he maintains), he must "point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998) (replaced in part on other grounds in *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321 (11th Cir. 1998)). Even though Archibald testified that he had seen some employees' disciplinary files, he could not offer specific names or indicate their contents at his deposition. Other than his assertions about the lack of discipline that his coworkers received, he has not pointed to any other evidence to suggest that

---

[22] As with many of the other claims, Archibald has made no response to UPS's argument that a one-day suspension is not an adverse employment action and made no attempt to distinguish his claims from those made in *Embry*. Importantly, it is the plaintiff's burden to show how an employment action is adverse. *See McCann*, 526 F.3d at 1375 n.6 (noting that when the plaintiff doesn't make out a *prima facie* case, there is no need to reach the issue of pretext). Thus, Archibald has abandoned this claim. *See Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326.

white employees were disciplined differently. *See Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 647–48 (11th Cir. 2005) (noting that the plaintiff did not personally witness anything that substantiated her position and instead relied only on statements from co-workers). The Court cannot infer an intent to discriminate based solely on Archibald's conclusory assertion that he was disciplined more than other employees. *See Rollins*, 833 F.2d at 1529.

Similarly, Archibald also failed to satisfy the *prima facie* case regarding his preparations for driving school. Diaz required Archibald to learn UPS's "5 Seeing Habits" and "10 Point Commentary," and UPS employees, including Diaz, regularly quizzed Archibald on these two documents before he attended driving school. Even if it is true, as Archibald suggests, that white employees did not have to memorize these documents, he did not suffer an adverse employment action. Archibald learned the documents, attended driving school, and graduated the school at the top of his class. He admitted at his own deposition that his knowledge of these two documents did not penalize him in any way. (Doc. 25-1 at 389.) Even though Archibald's wife produced a signed statement indicating that Archibald spent "countless hours reviewing the packet of information," he has not produced any evidence to show that the studies undermined his ability to work in any way. *See Davis*, 245 F.3d at 1239

(noting that an action is only an adverse employment action if it is objectively unreasonable).

In sum, Archibald has failed to satisfy all elements of his *prima facie* case for his disparate treatment claims based on discipline that he received as a UPS employee. He has also produced no additional circumstantial evidence of discrimination, and summary judgment is due to be granted on these claims.

## B.    Retaliation

Next, Archibald claims that the Defendants' actions were done in retaliation for his practice of filing grievances and complaining to the EEOC.[23] The Defendants moved for summary judgment, contending that Archibald had not satisfied the *prima facie* case that must be satisfied when the plaintiff relies on circumstantial evidence. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). In a section of his brief opposing summary judgment entitled "Retaliation," Archibald indicates that he is solely relying on "direct evidence" of retaliation. (Doc. 29 at 13–14.)

Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the

---

[23]   The Court notes that it is unclear exactly what employment actions are purportedly retaliatory. It is clear that the 2010 promotion claim cannot be retaliatory because the described grievances, discipline, and other issues referenced in the case occurred after the August 2010 promotions of Courington and Jemison. However, the Court will discuss the cover driving and disciplinary claims in the context of retaliation.

employee." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted). "One example of direct evidence would be a management memorandum saying, 'Fire [the plaintiff]—he is too old.'" *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (describing an example of direct evidence in the context of age discrimination). However, "only the most blatant remarks" constitute direct evidence of retaliation. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (internal quotation marks omitted).

Archibald has not produced direct evidence of retaliation. First, he argues that his regular filing of grievances coupled with the reduction in discipline establishes that the discipline was retaliatory. In most of these cases the discipline was only reduced and not eliminated. Moreover, he has not pointed to any comments in the disciplinary reports that provide blatant or obvious statements that either UPS or Diaz was retaliating against him. *See id*. Additionally, Archibald contends that disciplinary actions against him increased. These would provide, at most, only *circumstantial* evidence of discrimination, and not direct evidence. *Cf. Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (finding that the statement that an employer "didn't want to hire any old pilots" was direct evidence of age discrimination).

In his brief, Archibald *only* set out the standard for direct evidence and did not even alternatively reference the standard for circumstantial evidence. (Doc. 29 at 13–14.) Although he did discuss circumstantial evidence in the context of his discrimination and hostile work environment claims, he omitted any discussion of circumstantial evidence when discussing retaliation. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). Accordingly, the Court can properly grant summary judgment based on the lack of direct evidence and treat any claim based on circumstantial evidence as abandoned. *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (explaining that a district court may "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Alternatively, though, Archibald has not produced circumstantial evidence that would allow him to survive summary judgment on a retaliation claim. In order to make out a retaliation claim based on circumstantial evidence, the Plaintiff must show: (1) he engaged in protected expression; (2) he suffered an adverse employment action; and (3) there was a causal relation between the two. *Thomas v. Cooper Lighting, Inc.*,

506 F.3d 1361, 1363 (11th Cir. 2007). If the Plaintiff can establish the *prima facie* case, the employer then must articulate a non-retaliatory reason for the conduct. *Pennington*, 261 F.3d at 1266. However, "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.*

Archibald's first retaliation claim involves allegedly excessive observations by supervisors. He suggests that UPS supervisors, including Diaz, observed him more than they did other employees. In order to support his claim, he must produce evidence from which the fact-finder could conclude that he was subjected to an adverse action. *See Thomas*, 506 F.3d at 1363. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 2414 (2006) ("*Burlington*"). While the provision does not protect an employee from "petty slights or minor annoyances," a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. at 2415 (internal quotation marks omitted).

Although questions of adversity are generally left to the jury under the *Burlington* standard, Archibald has failed to produce any evidence to show that the observations were, in fact, excessive. *See Crawford v. Carroll*, 529 F.3d 961, 974 n.13 (11th Cir. 2008). Archibald testified that he faced "obsessive observations by management." (Doc. 25-1 at 426.) Given the approximately forty drivers, he thought it excessive that he was observed on his route roughly ten times over a year. (*Id.*) However, he lacks *any* personal knowledge of UPS's observation procedures:

> Q.   And did you ever speak to [UPS's employees who usually observed] about how they, it was decided what observations they would do?
> A.   No.
> Q.   And do you have any personal knowledge, firsthand knowledge of how many times [they] observed other drivers in that —
> A.   No.
> Q.   — time-frame?
> A.   No.
> Q.   So, you're just speculating that, that they were, they observed you more than they, more than they observed other people?
> A.   Yeah. You can say that.

(*Id.* at 427–28.) Moreover, the only testimony in the record based on personal knowledge of the observations comes from Diaz and Yul Cochran ("Cochran"). Both of them provided declarations that Archibald was never singled out for observation and was observed consistently with all other drivers. (Doc. 25-4 at 13–14 ¶ 24; Doc.

25-8 at 3 ¶ 6.) Ultimately, a plaintiff must show objectively that he was harmed in retaliation for his protected activity. *Burlington*, 548 U.S. at 68, 126 S.Ct. at 2415. Here, Archibald has not shown *any* injury or harm, and thus he cannot survive summary judgment on his theory that these actions were retaliatory.

Similarly, Archibald's claims based on the discipline that he received also fail because he cannot satisfy *Burlington*. The Supreme Court in *Burlington* effectively established a different standard for retaliation claims than discrimination claims. *See Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 608 n.5 (11th Cir. 2008) (declining to apply the *Burlington* decision to disparate treatment discrimination claims and limiting the decision to Title VII retaliation claims). For a retaliation claim, "the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford*, 529 F.3d at 973.

However, the *Burlington* standard does not excuse a plaintiff from his obligation to actually show that the conduct at issue would objectively deter him from engaging in statutorily protected activity. 548 U.S. at 68, 126 S.Ct. at 2415. Even though the Court must consider context when determining whether an action is adverse, the

employee bears the burden of placing *evidence* about that context into the record. *See id.* at 69, 126 S.Ct. at 2415. Here, Archibald has only produced evidence that shows that he and his wife were upset about UPS's actions. However, he did not testify that UPS's discipline made him less likely to file grievances or complain to the EEOC. Instead, he testified that he always filed a grievance when he disagreed with discipline, and he filed an additional EEOC charge after his first charge. Indeed, the evidence here suggests that UPS's actions did *not* deter Archibald from engaging in statutorily protected conduct. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (evaluating whether a job transfer was adverse in part by considering the plaintiff's testimony that she was not embarrassed by the transfer).

Apparently, Archibald attempts to argue that UPS's assignments of cover driving opportunities were retaliatory. Insofar as he has attempted to advance such a claim, summary judgment is due to be granted for the same reasons as his racial discrimination claims on this subject, discussed in Part III(A)(ii), *supra*. First, Archibald failed to produce any facts to suggest that his training was different from any other UPS employees, and he has failed to prove that his treatment was adverse at all. *See Burlington*, 548 U.S. at 68, 126 S.Ct. at 2415 (recognizing that minor trivialities are not regulated under the retaliation provision). Second, Archibald failed

to rebut that UPS's legitimate reasons for assigning cover driving opportunities, such as the need to qualify more drivers, route knowledge, and Archibald's limited availability due to his preload schedule were not a pretext for retaliation. *See Pina v. Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014) (emphasizing that, as in other cases involving summary judgment, in retaliation cases "a nonmovant cannot rely merely upon conclusory allegations, improbable inferences, and unsupported speculation" (internal quotation marks omitted)). Thus, summary judgment is due to be granted on Archibald's retaliation claims.

### C.    Hostile Work Environment

Finally, Archibald purports to bring a hostile work environment claim based on the Defendants' actions. A separate violation of Title VII or § 1981 occurs when "the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). An employer can be held liable if the employee proves that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the individual's membership in the protected class; (4) it altered the terms and conditions of employment and

created a hostile environment; and (5) the employer is responsible for this environment either directly or vicariously. *Id*.

Even though Archibald devoted several portions of his brief to discussions of "harassment" or "hostile work environment," he never cited to particular parts of the record to support his claim. *See* Fed. R. Civ. P. 56(c)(1)(A) (noting that a party seeking to assert that a fact is in dispute must "cit[e] to *particular parts* of materials in the record). Instead, Archibald asserted generally that Diaz harassed him "because of his African American hairstyle and . . . because of a single tattoo that was not visible unless Plaintiff was called at an inopportune time to work or when Plaintiff was not on the clock and considered not working" without citing to any materials in the record. (Doc. 29 at 13.)  Elsewhere Archibald noted generally that his harassment claims are supported by the grievances he has filed coupled with reductions in his discipline and the statements from his wife and various co-workers. (*Id*. at 15–16.) However, he does not indicate which portions of these materials support his claim. Thus, the Court can properly grant summary judgment on this basis alone. *See* Fed. R. Civ. P. 56(e)(3) (noting that the Court may grant summary judgment if a party fails to properly support an assertion of fact if the motion and supporting materials indicate that the movant is entitled to summary judgment).

Moreover, Archibald has not provided any evidence to suggest that he was subjected to a hostile work environment. Indeed, Archibald testified at his deposition that UPS has not directed any comments toward him that would suggest that *any* of its actions were based on race:

> Q.   Are you aware of any oral or written statement made by any UPS supervisor or manager that pertains to your race?
> A.   I don't get what you mean by the question.
> Q.   Has anyone made any race based comments to you - -
> A.   Oh, no.
> Q.   - - or any racial remark to you of any kind?
> A.   No.

(Doc. 25-1 at 422.)[24] Thus, there is no indication in the record that the workplace was permeated with racially hostile comments or actions. *Cf. Jones*, 683 F.3d at 1299–1301 (describing a hostile work environment based on ethnic slurs directed at the plaintiff, banana peels left in the plaintiff's vehicle, confederate apparel worn by co-workers, and a confrontation between the plaintiff and several of these co-workers). Even if Archibald could attempt to make a hostile work environment claim based on the discipline that he received, as the Court noted at length above he has not successfully

---

[24] Archibald cites various cases from the sexual harassment context to suggest that there is an independent claim for a supervisor's harassment in certain cases where there is no tangible employment action taken. Even assuming that this claim is applicable in the context of racial actions, Archibald's admission would preclude any such claim.

tied this discipline to his race. Summary judgment is due to be granted on the hostile work environment claim.

### D.     Amendment of the Complaint

In addition to opposing the motion for summary judgment, Archibald filed a motion for leave to amend his complaint, supposedly to add "new facts that were produced at [the] deposition of Defendant, Jaime Diaz." (Doc. 27.) He made this motion both after the close of discovery and after the Defendants had already filed their motion for summary judgment. The Court directed Archibald to brief the motion and attach a copy of his proposed amended complaint (Doc. 28), but Archibald never filed any such response with the Court. Thus, he has abandoned any argument that he is entitled to amend his complaint, and the motion is due to be denied. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

From Archibald's two-page motion, he has given no reason why the Court should allow amendment at this late stage in the litigation. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962) (explaining that leave to amend should generally be freely given but need not be allowed if there is a legitimate reason for

disallowing it). Indeed, "[p]rejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999). Although Archibald filed his motion before the Court ruled on summary judgment, he waited until well after the discovery period ended, dispositive motions were filed, and the briefing period had begun.

Moreover, even though the Defendants raised several issues regarding the sufficiency of pleading on summary judgment, the Court ignored those arguments and relied instead on the evidence in the record. Additional pleading would not rectify the Plaintiff's failure to uncover relevant facts through discovery that could withstand summary judgment. Thus, the motion is due to be denied.

## IV.    CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment (Doc. 23) is due to be granted, and Plaintiff's motion for leave to amend (Doc. 27) is due to be denied. A separate order consistent with this opinion will be entered.

Done this 15th day of July 2014.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

174256